Andrew Hursh, Montana Bar # 68127109
Wilderness Watch
PO Box 9175
Missoula, Montana 59807
Tel: 913-660-6034
andrewhursh@wildernesswatch.org

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| WILDERNESS WATCH, ALLIANCE FOR THE WILD ROCKIES; GALLATIN WILDLIFE ASSOCIATION; and YELLOWSTONE TO UINTAS CONNECTION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of Interior, <br><br> Defendant. | Case No. 9:23-CV-_____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF.** |

## I.     INTRODUCTION

1.     Wilderness Watch, Alliance for the Wild Rockies, Gallatin Wildlife Association, and Yellowstone to Uintas Connection ("Plaintiffs"), all non-profit environmental conservation organizations, file this lawsuit to challenge illegal action

by the United States Fish and Wildlife Service (FWS) in the Red Rock Lakes Wilderness. FWS, an agency of the Department of the Interior charged with administering this Wilderness area, has planned under a recent decision to install permanent pipeline infrastructure within the Wilderness. The aim of the pipeline is to manufacture improved fish habitat (an effect that remains uncertain), but such activity contravenes the strict legal protections provided in the Wilderness Act. Federal Wilderness designation and the clear provisions of the Wilderness Act provide for protected natural areas like Red Rock Lakes a freedom from human manipulation and a prohibition against such structures and installations as hydrology-rerouting pipelines. In deciding to install a pipeline, the Fish and Wildlife Service has chosen to elevate and manage toward desired conditions—arbitrarily chosen conditions on the landscape—rather than leave natural processes alone as the Wilderness Act requires.

2.     Plaintiffs thus seek declaratory relief holding unlawful the Fish and Wildlife Service's decision to construct a pipeline into Upper Red Rock Lake and injunctive relief prohibiting the agency from implementing the project.

## II.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., and the

Wilderness Act, 16 U.S.C. § 1131 et seq. The requested relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

4.  The federal government waived sovereign immunity and the challenged agency actions are final and subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

5.  Venue in this case is proper in this District under 28 U.S.C. § 1391(e)(1) because Plaintiffs Wilderness Watch, Alliance for the Wild Rockies, and Gallatin Wildlife Association are each located in this District, and all the events giving rise to the claims in this action occur in this District.

### III.  PARTIES

6.  Plaintiff Wilderness Watch is a national, non-profit conservation organization whose mission is the preservation and proper stewardship of lands and rivers in the National Wilderness Preservation System and the National Wild and Scenic Rivers System. To that end, since 1989, Wilderness Watch has engaged in public policy advocacy, congressional and agency oversight, public education, and litigation to promote sound stewardship of federal Wilderness areas and Wild and Scenic River corridors. Wilderness Watch is headquartered in Missoula, Montana.

7.  Plaintiff Alliance for the Wild Rockies is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Rocky Mountains; its native plant, fish, and animal life;

and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. Alliance for the Wild Rockies has over 2,000 individual members, many of whom are located in Montana. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

8.     Plaintiff Gallatin Wildlife Association is a local, all-volunteer wildlife conservation organization dedicated to the preservation and restoration of wildlife, fisheries, habitat and migration corridors in Southwest Montana and the Greater Yellowstone Ecosystem, using science-based decision making. Gallatin Wildlife Association is a nonprofit 501(c)(3) organization founded in 1976. Gallatin Wildlife Association recognizes the intense pressures on our wildlife from habitat loss and climate change and advocates for science-based management of public lands for diverse public values, including but not limited to hunting and angling.

9.     Plaintiff Yellowstone to Uintas Connection is a non-profit public interest organization based in Paris, Idaho with a subsidiary office in Bondurant, Wyoming. Yellowstone to Uintas Connection focuses its work on the Greater Yellowstone Ecosystem and its connecting wildlife corridors. Red Rock Lakes therefore lies directly within the organization's sphere of interest. Yellowstone to Uintas Connection is a science-based organization providing input to agency decision-making processes and provided detailed comments on the Draft Environmental Assessment for Arctic Grayling Conservation in Red Rock Lakes.

3

10.     The staff, members, and supporters of Plaintiff organizations have longstanding interests in preserving the wilderness character of federally designated Wilderness in the region encompassing the Greater Yellowstone Ecosystem, including in the Red Rock Lakes Wilderness. Members of Plaintiff organizations value Wilderness and have interests in protecting Wilderness whether or not they ever set foot inside its boundaries. They value Wilderness for its own sake, for the sake of the undisturbed ecosystems in Wilderness areas, and for the sake of current and future generations who rely on the preservation of Wilderness for a multitude of personal, spiritual, societal, and ecological reasons.

11.     Plaintiff organizations' staff, members, and supporters also visit the Red Rock Lakes Wilderness for wilderness-based recreational pursuits such as hiking, snowshoeing, canoeing, hunting, fishing, wildlife viewing, and aesthetic enjoyment. They seek out Red Rock Lakes because of its remoteness and its singularly large expanse of intact wetlands within the region, because of its diversity of habitats and wildlife, and because of its quietude and natural setting away from human development. Plaintiff organizations' staff, members, and supporters also work in fields like tourism, research, and academia that depend upon the wilderness character of protected areas like Red Rock Lakes, with minimally disturbed ecosystems, expansive and unfragmented natural landscapes, and immeasurable

environmental benefits that stem from leaving the area as unmanipulated by people as possible, as the law requires.

12.    The legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, wildlife and wilderness preservation interests of Plaintiffs and their staff, members, and supporters by intruding upon the natural systems in the Red Rock Lakes Wilderness with man-made infrastructure designed to modify the ecosystem and the habitat there. The activity of using heavy construction equipment to dig a mile-long trench and installing a permanent, 14-inch pipeline will disturb the peace and quiet and the solitude of the wilderness as well as permanently impair its natural, undisturbed quality. In addition to injury to the immediate experience of wilderness character through the construction and introduction of the pipeline, Plaintiffs' staff, members, and supporters will be injured by the permanent presence of this infrastructure supplanting natural, unconstrained ecological processes with outcome-driven environmental manipulations at the hands of Fish and Wildlife Service administrators.

13.    Defendant United States Fish and Wildlife Service (FWS) is an administrative agency within the United States Department of the Interior. FWS is entrusted with the management of national wildlife refuges and designated

Wilderness areas within refuge boundaries, including the Red Rock Lakes Wilderness within the Red Rock Lakes National Wildlife Refuge.

## IV.    LEGAL FRAMEWORK

14.    On April 22, 1935, President Franklin D. Roosevelt issued Executive Order 7023 designating the Red Rock Lakes Migratory Waterfowl Refuge. This order withdrew these subject lands from settlement or disposition and retained them in the federal estate set apart as "a refuge and breeding ground for wild birds and animals." An order from the Assistant Secretary of the Interior in 1961 renamed the refuge the Red Rock Lakes National Wildlife Refuge. 26 Fed. Reg. 6,647 (July 26, 1961).

15.    In 1964, Congress passed the Wilderness Act, which established the National Wilderness Preservation System and imposed legal requirements for federal administration of lands designated as Wilderness. Pub. L. 88-577, 78 Stat. 893-96 (Sept. 3, 1964); 16 U.S.C. § 1131 et seq. The Wilderness Act has an "explicit statutory purpose 'to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition.'" *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1055 (9th Cir. 2003) (en banc) (quoting 16 U.S.C. § 1131(a)).

6

16.    The Wilderness Act defines "wilderness" as "an area where the earth and its community of life are untrammeled by man," as "retaining its primeval character and influence," and as "protected and managed so as to preserve its natural conditions." 16 U.S.C. § 1131(c).

17.    Although the Wilderness Act recognizes that recreational and conservation-related activities can be appropriate within wilderness areas, *see* 16 U.S.C. § 1133(b), the statute places paramount its mandate of wilderness preservation, requiring that all activities in designated Wilderness be conducted in a manner that "preserv[es] . . . wilderness character" and "will leave [designated wilderness areas] unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a). Congress expressly prohibited certain activities in designated Wilderness that are defined by the Act to be antithetical to wilderness character preservation. The statute dictates that "there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation" within Wilderness areas. 16 U.S.C. § 1133(c). The only exception that this provision affords is for activities that are "necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." *Id.*

18.    The Wilderness Act imposes a legal duty on federal lands agencies that administer designated Wilderness to "preserv[e] the wilderness character of the

7

area." In a designated Wilderness area that may also have "other purposes for which it may have been established," the Wilderness Act expressly requires that administration for those purposes be conducted "as also to preserve its wilderness character." 16 U.S.C. § 1133(b).

19.    In 1976, Congress designated over 32,000 acres within the Red Rock Lakes National Wildlife Refuge as the Red Rock Lakes Wilderness, to be managed according to the provisions of the Wilderness Act. Pub. L. 94-557, 90 Stat. 2634 (Oct. 19, 1976).

20.    The U.S. Fish and Wildlife Service administers the broad, diverse National Wildlife Refuge system under a general statutory directive as follows:

> The mission of the System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans.

16 U.S.C. § 668dd(a)(2).

21.    Further broad-based directives for the National Wildlife Refuge System are to "provide for the conservation of fish, wildlife, and plants, and their habitats within the System" and to "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(4)(A)-(B).

8

22.     Regulations promulgated by the Fish and Wildlife Service expressly restate the restrictions of 16 U.S.C. § 1133(c) as applied to Refuge management. *See* 50 C.F.R. § 35.5 (2023).

23.     The Fish and Wildlife Service maintains a Service-wide Manual on refuge management, and it contains guidance and instruction on the agency's own internal policies for approaching its administration of designated Wilderness.

24.     "Preserving wilderness character," the FWS Manual makes clear, "is a primary criterion for judging the appropriateness of proposed refuge management activities[.] . . . Preserving wilderness character requires that we maintain both the tangible and intangible aspects of wilderness."

25.     The FWS Manual goes on to list those aspects, including "retaining the primeval character of and influence on the land" and "serving as a benchmark for ecological studies" (i.e., as an unmanipulated scientific control). Expounding further, FWS's discussion of its policy notes that "[w]ilderness character imposes upon us an obligation to leave to future generations what remains of the world we did not make and do not control. . . Maintaining wilderness character requires an attitude of humility and restraint. In wilderness, we do not adjust nature to suit people, but adjust human use and influences so as not to alter natural processes. We strengthen wilderness character with every decision to forego actions that have physical impact[.]"

26.     More specifically, the FWS Manual goes on to describe the narrow criteria under which the agency may authorize the types of uses generally prohibited by the Wilderness Act. Among those criteria are ensuring—as required by the act—that any such use authorized be both "necessary" and only the "minimum required" to accomplish Wilderness Act purposes. In reaching such a determination through a "minimum requirements analysis," FWS generally utilizes a "minimum requirements decision guide," an internal agency worksheet for analyzing various alternatives. "The alternative that has the least impact on the area's wilderness character, including intangible aspects of wilderness character, and accomplishes refuge purposes, including wilderness purposes, constitutes the minimum requirement," the Manual reads.

27.     The Administrative Procedure Act (APA), 5 U.S.C. §§ 553-559 and §§ 704-706, governs the decision-making, public process, and final actions taken by federal agencies. The APA establishes a right in members of the public harmed by federal agency decisions to redress unlawful actions; the statute authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Compliance with the APA hinges on an agency's well-reasoned decision-making and its consideration of all relevant factors (including statutory requirements) when it acts. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

10

*Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983); *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

## V.    FACTUAL BACKGROUND

### The Red Rock Lakes Wilderness

28.    The Red Rock Lakes Wilderness comprises a swath of wetlands and large, shallow lakes at the high end of a sweeping valley in remote southwestern Montana. The Centennial Valley, named for the mountain range that towers to the south, sits at about 6,500 feet of altitude. In this wild edge of the Greater Yellowstone Ecosystem, trumpeter swans took scarce refuge in the early twentieth century when the species was facing extinction.

29.    Recognition of the Red Rock Lakes' ecological integrity and environmental importance heightened by the 1930s, when the federal government set the area aside as a wetland reserve to protect habitat for the trumpeter swans and other waterfowl and fish and wildlife.

30.    However, early years of federal land management in and around Red Rock Lakes nonetheless demonstrated some ecological damage, even that motivated by what was considered the work of "conservation" at the time. Dams constructed on the Red Rock River blocked fish passage and habitat connectivity, stream reroutes (perceived as benefitting waterfowl) damaged native habitat for native fish like arctic grayling, and managers harvested and removed tens of millions of

grayling eggs to distribute to hatcheries for sportfishing stocking efforts elsewhere. On the Refuge, managers blocked passage to tributary spawning areas to create a pond in which they stocked arctic grayling, not understanding the detrimental effect this would ultimately have on the species.

31.    In 1976, to better secure the protection of much of Red Rock Lakes in its natural condition and to stave off future human impact and meddling, Congress designated the Red Rock Lakes Wilderness, consisting of 32,350 acres within the Wildlife Refuge, to be managed according to the strict mandate of the Wilderness Act.

### The Arctic Grayling

32.    The arctic grayling is a freshwater fish in the salmon family. It is widespread in the streams, rivers, and lakes feeding the North Pacific and Arctic Oceans from Russia, Alaska, and Canada, as well as those reaching the western shores of Hudson Bay in central Canada.

33.    In the coterminous United States further south, arctic grayling are native only to the upper headwaters of the Missouri River in Montana and Wyoming and to a few Michigan watersheds feeding the Great Lakes. Overfishing, habitat destruction, and the impacts of other fish species extirpated the native Great Lakes population early in the twentieth century.

12

34.    Arctic grayling in the upper Missouri River basin generally persist in two populations with different life-history forms: fluvial, or stream-dwelling; and adfluvial; or lake-dwelling. The fluvial population spends its life in the streams and rivers, while the adfluvial population occupies lakes, traveling to tributary streams only to spawn. In addition to the adfluvial populations in the few lakes in the region to which they are native, these fish also occupy numerous lakes around Montana and the West where they have been stocked for sportfishing and genetic reserves.

35.    Human activity on the landscape has extensively destroyed habitat for the arctic grayling in the upper Missouri River basin and depleted their former abundance. Livestock grazing, stream dewatering, agriculture, development, dams, fishing, competition with introduced non-native fish, and climate change have all taken a toll.

36.    Environmental groups have petitioned FWS to grant Endangered Species Act protections to the fluvial arctic grayling in the upper Missouri River Basin and have initiated lawsuits over the agency's failure to do so. Endangered Species Act protection would force substantial changes to activity throughout the wider upper Missouri River basin's arctic grayling habitat. It would reach beyond activities like FWS's administration of protected refuge waterways and would affect and restrict the broader spectrum of private and other governmental activity damaging habitat outside of areas like the Red Rock Lakes Wilderness.

37.    FWS has rejected numerous proposals over the decades to list the arctic grayling in upper Missouri River basin streams as a threatened or endangered species.

38.    The agency's position has generally been to depend upon the coordination of voluntary, rather than regulatory, habitat conservation efforts, and to argue that such efforts will be sufficient for the fish.

39.    An ongoing lawsuit filed in January 2023 by several environmental organizations challenges FWS's most recent Endangered Species Act decision-making with regard to the fluvial population of grayling occupying the Big Hole River and its tributaries in a portion of the upper Missouri River basin.

40.    In 2020, FWS issued its (challenged) determination that listing of the fluvial population was not warranted. Part of FWS's reasoning in reaching that determination relied upon the buffer provided by the existence of an adfluvial population in the Red Rock Lakes in the Centennial Valley.

41.    Upper Red Rock Lake, the largest of the Wilderness area's namesake lakes, is home to a small adfluvial population of arctic grayling. These fish spend the majority of their lives in the lakes but travel to tributary streams to spawn. FWS's 2020 Endangered Species Act determination described the status of this arctic grayling population as follows:

> Multiple lines of evidence indicate the Centennial Valley
> grayling population has a stable, but lower number of adult
> spawners than in the recent past, yet relatively high genetic
> diversity with a relatively robust effective population size.
> Little genetic variation has been lost in the population,
> despite the recent decline in adult spawners. Rate of
> expected loss of genetic diversity is low if current effective
> population size is maintained.

42.    Indeed, the arctic grayling population in Red Rock Lakes has seen its ups and downs. Long-term, landscape-scale impacts on the species' abundance have included, among other factors, livestock grazing, which damages spawning habitat in streams and increases sediment in the lakes; stream de-watering through irrigation; fragmentation of spawning tributaries and connection to other populations; fishing impacts; and competition and predation from non-native fish introduced for sportfishing.

43.    In Red Rock Lakes, a significant and entirely natural influence that may drive booms and busts in arctic grayling abundance is winter. Every winter, shallow lakes like Upper Red Rock Lake become buried in ice and snow, and as the depth of this cover increases, blocking light and arresting the inflow and turbulence of the summer months, the processes that generate oxygen in the lakes' water slow. And decomposition of organic matter, which depletes oxygen, continues. At a certain point, the minimally oxygenated water can become "hypoxic." Prolonged exposure

to hypoxic conditions will stress fish, and a harsh winter in a more hypoxic lake may increase mortality and affect the abundance of arctic grayling overwintering there.

44.    Arctic grayling have a relatively high tolerance to hypoxia exposure, but their winter survival and the consequent size of a lake-dwelling population like that in Upper Red Rock Lake are inherently limited by the volume of water that maintains about 4 parts per million of dissolved oxygen or greater, areas to which the fish can navigate and linger until the ice thaws.

45.    Some winters are harsher than others. During the winter of 1994-1995, for example, Upper Red Rock Lake saw relatively extensive and persistent ice and snow cover. This compounded with 1994 being a low water year with a greater abundance of aquatic vegetation than in some other years, adding fuel for wintertime decomposition and oxygen depletion. A researcher on the lake that winter measured the lowest dissolved oxygen concentrations, or greatest hypoxic conditions, observed to date.

46.    Population sampling in 1995, consequently, demonstrated a crash in arctic grayling abundance to about a third of the previous years' estimate, from an estimated spawning population of 407 to 122.

47.    The grayling rebounded over the next decade to an estimated spawning population of over 2,000 in 2014 and about 1,100 in 2015. But starting in about

2016, the population dropped again, and in the past several years has been at historic lows.

### **Designs to Manipulate Upper Red Rock Lake**

48.    Beginning around 2011, FWS convened with other federal and state agencies to coordinate plans for arctic grayling habitat conservation and restoration efforts in the upper Missouri River basin. An early goal within that group's planning efforts was to elect a target grayling population for Upper Red Rock Lake. The authors of a later report on the consequent "Adaptive Management Plan" summarized this task as follows:

> [S]electing a spawner abundance threshold that relates to the long-term goal of self-sustaining persistence is an inevitably subjective task because of inherent uncertainty about the range and relative likelihood of future outcomes.

49.    The planners' route through this subjective evaluation was to select a population size at which they predicted the greatest probability of persistence over 10-, 25-, and 50- year timescales. A population of 1,000 or greater, they speculated, was more likely to persist long-term, on its own, than any smaller target.

50.    Thus, in 2014, FWS and the other developers of what would become the "Centennial Valley Arctic Grayling Adaptive Management Plan" defined a desired abundance threshold at a population of 1,000 spawning grayling in Upper Red Rock Lake.

51.    The planners were in luck. The population size they had chosen as one "where long-term self-sustaining persistence of grayling was expected" had at that time been achieved. The estimated spawning population in 2014 was already more than double the target.

52.    Soon thereafter, the rapid (although not unprecedented) population swing described above occurred. A 2015 estimated spawning population of over 1,100 was followed by 2016's estimate of only 214.

53.    FWS has cited harsh winters in 2016 and 2019 for the decline, but the dynamic is difficult to clearly isolate. The area has seen many similar winters throughout the decades, and the 2016 decline also fell several years after liberalized fishing regulations, coincided with more intensive monitoring disturbance, and could be related to impacts from activities like livestock grazing, which can both damage spawning habitat and contribute sediment and nutrients that indirectly affect wintertime hypoxia in the lake.

54.    In response to the 2016 population decline, FWS and its Adaptive Management Plan partners changed their tune. They were unwilling to depend upon the "self-sustaining" initial target selection—to trust that the grayling abundance might naturally fluctuate back upward as it had in the past. Based on an apparent conclusion that the predicted self-sustaining nature of the selected target was

erroneous, 1,000 spawning grayling became an arbitrarily chosen static target, one that required active intervention to sustain.

55.    The Adaptive Management Plan, formally adopted in 2017, called for action to bolster the population to that level whenever it fell below.

56.    FWS next sought to determine what the main barriers to achieving its target population were. The agency looked intensively at three potential limiting factors: spawning habitat, winter habitat, and the effects of non-native fish. FWS did not as intensively assess fishing impacts, grazing impacts, or those from management activity—as later urged by comments from the public. The agency dismissed concerns about these additional factors with more general speculation about their lack of relevance.

57.    FWS's approach to the three factors it chose was to craft mathematical models of grayling abundance dynamics in relation to these factors, based on previously collected data. Then, FWS's researchers ran each of the three models through a series of simulations. Starting with an initial hypothetical grayling population (the mean figure from prior estimates), the models apply a randomized figure for available spawning habitat, or available winter habitat (the inverse of the severity of hypoxia), or abundance of nonnative trout, over 15 successive simulated years.

58.    FWS concluded, based on the output of this approach, that winter habitat conditions impose the greatest constraint on arctic grayling achieving the target abundance.

59.    Thus, although winter in the Red Rock Lakes Wilderness is a natural phenomenon, the agency set its sights on modifying the winter habitat to better pursue its grayling population goals.

60.    Artificially bolstering the Upper Red Rock Lake grayling population in this way accommodates FWS's logic for rejecting the long-requested regulatory approach of Endangered Species Act listing, which would encompass a host of other conservation requirements more targeted at anthropogenic sources of harm. If the agency can point to the stability of the Centennial Valley grayling population, as it has previously when rejecting Endangered Species Act petitions, then it can stave off the more substantive and challenging requested action of mitigating human impacts that damage grayling habitat on and off the Refuge, and enforcing rules to that effect.

**The Agency's Action**

61.    FWS devised a series of alternatives for altering the winter habitat in Upper Red Rock Lake. Each involved some method for introducing supplemental oxygen via man-made infrastructure. After some time spent developing ideas with other agencies involved in the Adaptive Management Plan, contracting a consulting

firm to assess engineering and feasibility, and hosting a "structured decision making" process to consider its options, FWS settled on six alternatives that it described in a draft Environmental Assessment (EA) released to the public in February 2023.

62.    In the years leading up to the Environmental Assessment, FWS went ahead and implemented, without public process or environmental analysis, some actions to manipulate the Red Rock Lakes Wilderness habitat to favor grayling.

63.    One such action has been the release of water from a man-made pond on the Refuge outside the Wilderness boundary. Water from this source, Widgeon Pond, drains into Upper Red Rock Lake (which sits entirely within the Wilderness). By using a water control structure at Widgeon Pond to artificially add inflow to Upper Red Rock Lake during the winter, the agency contributes additional dissolved oxygen. FWS began this activity in the winters of 2020-2021 and 2021-2022, prior to releasing the EA.

64.    Another action has been the physical breaching of beaver dams both inside and outside the designated Wilderness. FWS began "notching" the dams in 2017 in order to manipulate the habitat in tributary streams to better support grayling spawning.

65.    Consequently, Alternative A in FWS's February 2023 EA, labeled the "No Action Alternative," was actually an alternative that included continuation of

21

the Widgeon Pond releases and beaver dam notching actions that the agency already initiated.

66.    Alternatives B through F each involved the continuation of those actions with the addition of more significant environmental manipulation. Alternative B would use electric powered splashers or diffusers to increase winter oxygen levels in Upper Red Rock Lake. Alternative C would use a generator-powered electric pump to pipe oxygen-depleted water from the lake to an aeration machine in a nearby campground before returning it. Alternative D—the ultimate subject of the present complaint—was to bury a pipeline stretching a little over a mile from Shambow Pond, just outside the Wilderness boundary, into Upper Red Rock Lake, to add somewhat more oxygenated water in the winter. Alternative E was to construct an impermeable wall stretching approximately 1,000 meters into Upper Red Rock Lake to force water from an inlet stream to reach closer to the lake's center. Alternative F was to carry out the construction in alternative E but to add the dredging of sediments from the lake near the mouth of the inlet stream.

67.    Again without public process, FWS implemented the electric powered diffusers described in Alternative B in the winter of 2022-2023. In response to public criticism over this habitat manipulation and the quiet authorization of prohibited activities in designated Wilderness, the agency explained that it had wanted to run a pilot project to test the system. As the agency wrote in its subsequent minimum

requirements analysis, this "did not produce habitat the modeling predicted and was dismissed."

68.    On May 31, 2023, FWS published the final version of its EA on the arctic grayling conservation project. On June 5, 2023, the agency published its "Finding of No Significant Impact," which also served as a "Decision to Implement Conservation Efforts for Arctic Grayling," to conclude its National Environmental Policy Act work under the EA. Finally, the agency published its "Final Environmental Action Statement." These operative documents were signed by the Refuge Manager, Assistant Regional Director, and Regional Director. The FWS decisionmakers selected and authorized the action under Alternative D: to install a permanent pipeline for winter-time diversion of water from Shambow Pond into Upper Red Rock Lake.

69.    FWS also released its "minimum requirements decision guide," an internal guidance worksheet the agency fills out to assist in and document its "minimum requirements analysis" for Wilderness Act compliance. This document was signed by the Refuge Manager and Assistant Regional Director on May 23, 2023, also selecting the Shambow Pond pipeline project for implementation.

**The Agency's Wilderness Act Analysis**

70.    FWS's approach of artificially manipulating the Upper Red Rock Lake habitat to facilitate desired grayling numbers puts the agency at odds with its

23

statutory Wilderness management mandate to leave the "earth and its community of life…untrammeled by man." 16 U.S.C. § 1131(c). The very purpose of setting aside Wilderness areas is to reserve a small portion of the landscape to be free from the unintended consequences of acting on human assumptions and the pernicious human influence that dominates elsewhere. The Act assures that the human population "does not occupy and modify all areas" and provides designated areas "preservation and protection in their natural condition." 16 U.S.C. § 1131(a).

71.    FWS utilizes a "minimum requirements decision guide" or "minimum requirements analysis" to help guide agency decision-making about whether activities it is considering are permissible under the law.[1] A pipeline, for instance, is a "structure or installation," among the things expressly prohibited by 16 U.S.C. § 1133(c), a provision that provides only narrow exception for when a nonconforming use is "necessary to meet [the] minimum requirements" of Wilderness preservation.

---

[1] In its policy work and other engagement with federal agencies, Wilderness Watch discourages reliance on the "minimum requirements decision guide" as presently constructed. The approach, which compartmentalizes the holistic mission of the Wilderness Act into rigid, quantitatively structured constituent parts that are neutered of their interconnected vision, in practice lulls managers into a check-the-box routine. In application, the guide tends to elevate filling out the paperwork to justify a preordained decision over substantively questioning the need for a decision or action in the first place, as the Wilderness Act's requirements call for. Nevertheless, these decision guide documents can provide a window in to the reasoning and factual bases for agency decisions and—as here—can illustrate the arbitrariness and unsound logic sometimes underpinning them.

72.    A minimum requirements analysis, the FWS Manual explains, "clarifies the need for and impacts of a proposed action. We authorize an activity only if we demonstrate that it is necessary to meet the minimum requirement for administering the area as wilderness and necessary to accomplish the purposes of the refuge, including Wilderness Act purposes."

73.    The Manual notes that the analysis is meant "to determine whether the proposed refuge management activity is necessary." Thus, the decision guide prompts the decisionmaker, at step one, to make a determination of necessity—a determination about *whether* to act toward a proposed objective—before proceeding to consider *how*.

74.    FWS's Manual and decision guide then carry over the "minimum requirements" phraseology into a subsequent consideration of means. In other words, once an action is deemed necessary, the guide prompts an analysis so that nonconforming uses are minimized. The Manual explains: "The alternative that has the least impact on the area's wilderness character, including intangible aspects of wilderness character, and accomplishes refuge purposes, including wilderness purposes, constitutes the minimum requirement."

75.    For the arctic grayling habitat manipulations assessed here, FWS's initial approach to necessity under step one of its decision guide contradicted both itself and the guide's legal analysis prompt.

76. First, in its introductory material, the agency described the statute designating the Red Rock Lakes Wilderness as specifically mentioning the arctic grayling, and thus somehow necessitating intervention via artificial habitat control even at the expense of Wilderness. That law makes no such mention. *See* Pub. L. 94-557, 90 Stat. 2634 (Oct. 19, 1976).

77. Further illustrating this contradiction, FWS explicitly recognized when prompted by the guide that the contemplated action "is not necessary to meet the requirements of other federal laws" besides the Wilderness Act.

78. Second, the agency's approach to the question of necessity ignores the Wilderness Act's directive that "other purposes," even where they may exist by statute, may only be pursued "as also to preserve wilderness character." 16 U.S.C. § 1133(b). An action that may be necessary for some "other purpose" but is not necessary to preserve wilderness character is not necessary under the Wilderness Act's "minimum requirements" provision at 16 U.S.C. § 1133(c).

79. Within the first prompt in FWS's decision guide is to consider whether action to address the situation motivating the proposal can be taken outside of Wilderness. In its May 23, 2023 decision guide documentation, FWS checked the box for "no" at this step.

80. However, the agency's narrative explanation contradicted its choice. This explanation described the ongoing release of water from Widgeon Pond, which

26

"boosted dissolved oxygen to the point that suitable habitat existed across a large portion of the lake." The agency then went on to compare the speculated effectiveness of the Widgeon Pond releases, which required "further study," with the perceived effectiveness of the more intensive alternatives based on "recent modeling."

81.    But the Widgeon Pond releases *already* demonstrated a commitment to manipulating the Wilderness habitat. FWS did not frame its response in terms of what *non*-Wilderness-manipulating action could be taken, for example, on the broader landscape outside the Wilderness area, to protect grayling habitat. Instead, FWS began from the premise that it was assessing *how*, not *whether*, to artificially modify and oxygenate Upper Red Rock Lake.

82.    Moving on from there, the agency's "minimum requirements decision guide" dissects "wilderness character" into four component parts: untrammeled, undeveloped, natural, and solitude/primitive or unconfined recreation.[2] This approach is reductive and is not consonant with a holistic reading of the Wilderness

---

[2] This severing of wilderness character into rigid, dissociated, and sometimes needlessly oppositional components derives from another internal agency guidance document that researchers designed to facilitate independent monitoring of impacts to Wilderness areas over time. The intent of the design was not to reinterpret the Wilderness Act for decision-making purposes or to pre-judge the impact of management actions based on their perceived effect in a trade-off between one monitoring parameter and another. Thus, Wilderness Watch strives to persuade agencies against employing this formulaic and reductive approach in management planning. Nonetheless—as here—the documentation that agencies produce even under this approach can illustrate areas where their decision-making contradicts the law.

Act, but it does require land managers to explain and defend their reasoning for an action's statutory compliance.

83.    For this project, FWS determined that artificially bolstering the grayling population was not necessary in Wilderness to further three out of the four facets of wilderness character, but that it was necessary to further "naturalness" by assisting a population of native grayling that had declined after recent harsh winters. The agency stated in passive terms that "there is an assumption the population may become extirpated unless dissolved oxygen is enhanced."

84.    FWS did not determine how or whether a purported improvement in "naturalness" would outweigh the lack of necessity under the other considerations.

85.    In fact, in contradiction with its ultimate decision, the agency made clear in its "determination of necessity" that such outweighing was not possible:

> Preserving the Natural Wilderness Character Quality while significantly degrading the Untrammeled, Undeveloped, and Outstanding Opportunities for Solitude or Primitive & Unconfined Recreation Wilderness Character Qualities would not be consistent with the Wilderness Act.

86.    Through the rest of its "minimum requirements decision guide" content, FWS substantively assessed the relationship between the various considered alternatives and wilderness character preservation. The agency ultimately quantified

each alternative with a number rating to signify its wilderness character-degrading or enhancing effect.

87.    The results demonstrated that *none* of the agency's alternatives, including the "no action" or "status quo action" alternative, would benefit wilderness character. Instead, all of them, to varying degrees, were rated as degrading wilderness character.

88.    For example, under the parallel to the EA's "no action" alternative, which actually describes Wilderness habitat manipulation actions in the form of beaver dam breaching and water additions from a nearby manmade pond, the agency's assessment resulted in quantification of a slight improvement in "naturalness" that was negated by the detrimental effects on the other facets of wilderness character. This alternative received a score of "-2." FWS noted that "releasing water into a tributary during winter, and notching beaver dams prior to grayling spawning are manipulations of natural processes, and negative impacts on the Untrammeled Wilderness Character Quality." It noted also that negative impacts on beaver should weigh against any purported improvement in "naturalness" on behalf of fish.

89.    Each of the subsequent alternatives scored worse.

90.    FWS illustrated its quantitative summary of the remaining wilderness character scores as shown below.

**MRDG Step 2: Alternative Comparison**

| Alternative 1: | Water releases, beaver dam notching, limited angling closures |
| Alternative 2: | Splasher Aeration |
| Alternative 3: | Diffuser Aeration |
| Alternative 4: | Aerator with Recirculating Pump and Pipelines |

| Wilderness Character | Alternative 1 | | Alternative 2 | | Alternative 3 | | Alternative 4 | |
|---|---|---|---|---|---|---|---|---|
| | Positive | Negative | Positive | Negative | Positive | Negative | Positive | Negative |
| Untrammeled | 0 | 2 | 0 | 3 | 0 | 3 | 0 | 3 |
| Undeveloped | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 4 |
| Natural | 3 | 1 | 4 | 4 | 4 | 4 | 4 | 4 |
| Solitude/Primitive/Unconfined | 0 | 2 | 0 | 6 | 0 | 5 | 0 | 5 |
| Other Features of Value | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 3 | 5 | 4 | 17 | 4 | 16 | 4 | 16 |
| Wilderness Character Rating | -2 | | -13 | | -12 | | -12 | |

| Alternative 5: | Shambow Pond Diversion Pipeline |
| Alternative 6: | Permanent Barrier from Elk Springs Creek to Lake Center |
| Alternative 7: | Elk Springs Creek Dredge and Deflection Berm |
| Alternative 8: | |

| Wilderness Character | Alternative 5 | | Alternative 6 | | Alternative 7 | | Alternative 8 | |
|---|---|---|---|---|---|---|---|---|
| | Positive | Negative | Positive | Negative | Positive | Negative | Positive | Negative |
| Untrammeled | 0 | 4 | 0 | 3 | 0 | 4 | 0 | 0 |
| Undeveloped | 0 | 3 | 0 | 4 | 0 | 4 | 0 | 0 |
| Natural | 4 | 4 | 4 | 5 | 4 | 5 | 0 | 0 |
| Solitude/Primitive/Unconfined | 0 | 5 | 0 | 6 | 0 | 6 | 0 | 0 |
| Other Features of Value | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 4 | 16 | 4 | 18 | 4 | 19 | 0 | 0 |
| Wilderness Character Rating | -12 | | -14 | | -15 | | 0 | |

91.    Under the agency's guidance and a plain reading of 16 U.S.C. § 1133(c), therefore, the only lawful decision would be "no action." In fact, a true "no action" alternative—not including the environmental manipulations the agency had already acted upon without adequate process—would be the only lawful selection.

92.    Nonetheless, FWS selected Alternative 5—the Shambow Creek pipeline—in completing the minimum requirements analysis. This corresponded with Alternative D from the EA as selected by the other decision documents.

93.    FWS's analysis found that the Shambow Creek pipeline would degrade the "untrammeled" facet of wilderness character:

> Operation of the pipeline would divert East Shambow Creek and prevent it from entering Upper Red Rock Lake, which is a negative impact on a natural process and the Untrammeled Wilderness Character Quality. Operation of the pipeline is also a manipulation of the natural process of ice formation, and an additional negative impact on the Untrammeled Wilderness Character Quality.

94.    FWS's analysis found that the Shambow Creek pipeline would degrade the "undeveloped" facet of wilderness character:

> Transport of personnel and materials would include the use of motors and mechanical transport in Wilderness, which would negatively impact the Undeveloped Wilderness Character Quality. Construction of the pipeline and its components would include the use of motors and mechanical transport, which would negatively impact the Undeveloped Wilderness Character Quality. The permanent pipeline and its components installed in Wilderness are installations, which would negatively impact the Undeveloped Wilderness Character Quality.

95.    FWS's analysis found that the Shambow Creek Pipeline would have a neutral, net-zero effect on the "natural" facet of wilderness character:

> Motors, mechanical transport, and construction would disturb the distribution of plant and animal species, and

> would be negative impacts to the Natural Wilderness
> Character Quality. . . . Operation of the pipeline is
> predicted to provide additional suitable habitat and
> improve survivorship for the indigenous grayling
> population, however it also would have negative impacts
> to other species.

96.    FWS's analysis found that the Shambow Creek pipeline would degrade

the "solitude or primitive and unconfined recreation" facet of wilderness character:

> Transport, and Construction of the pipeline would involve
> some motor noise, which would negatively impact the
> SPUR Wilderness Character Quality. . . A portion of the
> pipeline will be visible to boaters, which is an indication
> of civilization and a negative impact on the SPUR
> Wilderness Character Quality.

97.    Regardless of its own analysis of the Shambow Creek pipeline showing

no benefit to wilderness character and instead significantly degrading it, FWS

selected and approved this alternative in its minimum requirements decision guide

and in its other decision-making documents.

98.    In explaining this incongruous decision, FWS stated that "the purpose

of this analysis is to determine which Alternative supports conservation of the

[Upper Red Rock Lake] population of grayling while having the minimum negative

impact on wilderness character."

99.    That statement contradicts the agency's own guidance (and the law)

regarding how the analysis is meant to consider the strictures of the Wilderness Act

and determine "*whether* the proposed refuge management activity is necessary" (emphasis added).

100.   And the agency's subsequent explanation proceeded to contradict even its own erroneous framing. The Shambow Creek pipeline alternative, the agency explained, "has approximately 8.4 times the negative impact to Wilderness character comparted to Alternative 1," so it was *not* the alternative with the least negative impact.

101. FWS acknowledged and was aware of some of the specific environmental harms of this project, which it chose to trade away for a speculated benefit to grayling. "Beaver dam notching has a negative impact on beaver," the agency wrote, and "[o]peration of the pipeline . . . would have negative impacts to other species." FWS received numerous public comments expressing concern for such impacts, including those to trumpeter swans and other migratory birds, to grizzly bears and other wildlife, and to native vegetation.

102.   As FWS rationalized, Alternative 1 had "uncertainty of the temporal nature of its effects," while "Alternative 5 [the Shambow Creek pipeline] was thought to be more reliable. For these reasons Alternative 5 (D in EA) was selected as the Minimum Requirement."

103.   In ultimately basing its decision on speculated reliability as an intervention to help achieve FWS's desired grayling population, the agency thus

33

abandoned any attempt to assess its proposals under the Wilderness Act's strict requirements and base its decision on Wilderness Act compliance.

### The Agency's Implementation Plans

104.    Through its selection of Alternative 5 under the minimum requirements analysis, FWS authorized six months of mechanical transport, motorized equipment, motor vehicle, and temporary road use in the Red Rock Lakes Wilderness.

105.    FWS authorized the permanent use and maintenance of the pipeline installation.

106.    On information and belief, FWS plans to implement the project as approved in the immediate future, with an aim to install the pipeline prior to the 2023-2024 winter season.

107.    On information and belief, the agency intends to carry out the construction during the summer of 2023. FWS is currently in the process of soliciting contractors to do the construction work.

## VI.    LEGAL CLAIMS

### CLAIM ONE: VIOLATION OF THE WILDERNESS ACT

### SHAMBOW POND PIPELINE

108.    Plaintiffs hereby reallege and reincorporate all above paragraphs.

109.    The Wilderness Act charges FWS with a duty to preserve the wilderness character of the Red Rock Lakes Wilderness. 16 U.S.C. § 1133(b). The

34

Wilderness Act defines Wilderness "in contrast with those areas where man and his own works dominate the landscape," as "an area where the earth and its community of life are untrammeled by man," as "retaining its primeval character and influence," and as "protected and managed so as to preserve its natural conditions." 16 U.S.C. § 1131(c). Among its provisions to further the protection of wilderness character, the Wilderness Act expressly prohibits structures and installations, "except as necessary to meet minimum requirements for the administration of the area" as Wilderness. 16 U.S.C. § 1133(c).

110.   FWS's authorization of the project to construct a pipeline from Shambow Creek into Upper Red Rock Lake violates the Wilderness Act because the project undermines the goals of the Wilderness Act and because the expressly statutorily prohibited activities that the project entails are not "necessary to meet the minimum requirements for the administration of the area" as Wilderness.

111.   Because FWS's decision to implement the project was arbitrary, capricious, an abuse of discretion, and contrary to law—including the Wilderness Act, 16 U.S.C. § 1131 et seq.—this Court must hold unlawful and set aside the agency's decision under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## CLAIM TWO: VIOLATION OF THE WILDERNESS ACT

## WIDGEON POND DIVERSION

112.   Plaintiffs hereby reallege and reincorporate all above paragraphs.

113.   FWS's authorization and implementation of actions to artificially divert water from Widgeon Pond into the Red Rock Lake Wilderness violated the Wilderness Act because such actions undermine the goals of the Wilderness Act and because the action included expressly statutorily prohibited activities not necessary to meet the minimum requirements for the administration of the area as Wilderness.

114.   Because FWS's decision to implement Widgeon Pond diversion was arbitrary, capricious, an abuse of discretion, and contrary to law—including the Wilderness Act, 16 U.S.C. § 1131 et seq.—this Court must hold unlawful and set aside the agency's decision under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). This Court must also enjoin the agency from implementing further action pursuant to that decision.

## CLAIM THREE: VIOLATION OF THE WILDERNESS ACT
## BEAVER DAM NOTCHING

115.   Plaintiffs hereby reallege and reincorporate all above paragraphs.

116.   FWS's authorization and implementation of actions to artificially demolish beaver dams in the Red Rock Lake Wilderness violated the Wilderness Act because such actions undermine the goals of the Wilderness Act and because the action included expressly statutorily prohibited activities not necessary to meet the minimum requirements for the administration of the area as Wilderness.

117.   Because FWS's decision to implement beaver dam destruction was arbitrary, capricious, an abuse of discretion, and contrary to law—including the Wilderness Act, 16 U.S.C. § 1131 et seq.—this Court must hold unlawful and set aside the agency's decision under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). This Court must also enjoin the agency from implementing further action pursuant to that decision.

## CLAIM FOUR: VIOLATION OF THE WILDERNESS ACT
## UPPER RED ROCK LAKE DIFFUSER INSTALLATION

118.   Plaintiffs hereby reallege and reincorporate all above paragraphs.

119.   FWS's authorization and implementation of actions to install electric powered diffuser aerators on the lake surface in the Red Rock Lake Wilderness violated the Wilderness Act because such action undermines the goals of the Wilderness Act and because the action included expressly statutorily prohibited activities not necessary to meet the minimum requirements for the administration of the area as Wilderness.

120.   Because FWS's decision to install the diffusers during the 2022-2023 winter season was arbitrary, capricious, an abuse of discretion, and contrary to law—including the Wilderness Act, 16 U.S.C. § 1131 et seq.—this Court must declare unlawful the agency's action under the Administrative Procedure Act, 5 U.S.C.

§ 706(2)(A). This Court must also enjoin the agency from conducting further similar action.

## VII.   REQUESTS FOR RELIEF

121.   For all the above-stated reasons, Plaintiffs respectfully request that this Court grant relief as follows:

a.    Declare that FWS's decision to approve the Shambow Creek to Upper Red Rock Lake pipeline project violates the Wilderness Act and its implementing regulations by authorizing the construction, installation, and maintenance of a water conveyance pipeline within the Red Rock Lakes Wilderness;

b.    Vacate FWS's June 1, 2023 "Finding of No Significant Impact and Decision to Implement Conservation Efforts for Arctic Grayling";

c.    Vacate FWS's June 1, 2023 "Environmental Action Statement";

d.    Grant temporary, preliminary, and permanent injunctive relief to prohibit FWS from implementing the challenged project;

e.    Declare that FWS's actions to implement the Widgeon Pond diversion, beaver dam notching, and diffuser aerator installation violated the Wilderness Act and its implementing regulations;

      f.      Grant injunctive relief to prohibit FWS from further implementing these challenged actions;

      g.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorney fees, associated with this litigation; and

      h.      Grant Plaintiffs such further relief as this Court may deem just, proper, and equitable.

Date: June 26, 2023             */s/ Andrew Hursh*
                                Andrew Hursh, Montana Bar #68127109
                                Attorney for Plaintiffs