IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDERNESS WATCH, ALLIANCE FOR THE WILD ROCKIES, GALLATIN WILDLIFE ASSOCIATION, and YELLOWSTONE TO UINTAS CONNECTION,<br><br>                    Plaintiffs,<br><br>vs.<br><br>UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of Interior,<br><br>                    Defendant,<br><br>     and<br><br>MONTANA DEPARTMENT OF FISH, WILDLIFE AND PARKS,<br><br>                    Defendant-Intervenor. | CV 23–77–M–DWM<br><br><br>OPINION<br>and ORDER |

Plaintiffs challenge the United States Fish and Wildlife Service's (the "Service") decision to install a permanent pipeline for Arctic grayling in the Red Rock Lakes Wilderness of southwestern Montana. Plaintiffs are environmental organizations that claim the decision violates the Wilderness Act, 16 U.S.C. §§ 1131–36. The Service has indicated that construction activity could begin as

1

soon as August 15, 2023, (*see* Doc. 19-5 at ¶ 3), and Plaintiffs seek a preliminary injunction, (Doc. 6). A motion hearing was held on July 27, 2023. Because Plaintiffs have shown that preservation of the status quo is appropriate to allow complete judicial review of agency action before a permanent alteration is made to a wilderness area, the motion is granted.

## BACKGROUND

In 1935, President Franklin D. Roosevelt designated the Red Rock Lakes National Wildlife Refuge in the Centennial Valley in southwestern Montana as a "refuge and breeding ground for wild birds and animals." (Doc. 7-5 at 5.) In 1976, Congress designated a portion of this area—32,350 acres of wetlands and large, shallow lakes—as the Red Rock Lakes Wilderness. *See* PL-557, 90 Stat. 2633 (Oct. 19, 1976) (codified at 16 U.S.C. § 1132). Under the Wilderness Act of 1964, federal land management agencies are statutorily obligated to "preserv[e] the wilderness character of the area." 16 U.S.C. § 1133(b). The Act defines "wilderness" as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." *Id.* § 1131(c). Consistently, while recreational and conservation-related activities can be appropriate in such areas, *see id.* § 1133(b), certain activities are generally prohibited: "there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical

transport, and no structure or installation," *id.* § 1133(c). The only exception to this provision being activities that are "necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." *Id.* It is within this framework that Plaintiffs' challenge arises.

## I.   Montana Arctic Grayling (*Thymallus arcticus*)

The Arctic grayling is a freshwater fish in the salmon family that resides in the Upper Missouri River drainage in southwestern Montana. (Doc. 7-5 at 4.) The Centennial Valley, located in the Upper Missouri River drainage, contains one of four remaining populations of Arctic grayling in the contiguous United States "still exhibiting the full spectrum of life history behaviors present in historical grayling population." (*Id.*) According to the Service, this specific population is a discrete genetic group "considered vital to long-term conservation of Arctic grayling genetic diversity in Montana." (*Id.* at 7.) Currently, most of the Centennial Valley grayling population spawns in Red Rock Creek and spends nonbreeding portions of the year in Upper Red Rock Lake, which measures approximately 2,900 acres with a maximum depth of about six and a half feet. (Doc. 7-3 at 5–6.) After recently peaking at 1131 fish in 2015, the estimated grayling spawning population in Red Rock Creek has declined to 88 fish in 2021 and 73 fish in 2022. (Doc. 19-4 at 1; Doc. 7-3 at 2.)

In 2011, the Service began to coordinate with other federal and state agencies to pursue habitat conservation and restoration efforts for Arctic grayling in the Centennial Valley. (*See* Doc. 7-7 at 5.)  One of the early goals was to elect a target grayling population for Upper Red Rock Lake. (*Id.*)  In 2017, these groups adopted the "Centennial Valley Arctic Grayling Adaptive Management Plan," which defined a desired abundance threshold at a population of 1,000 spawning grayling in Upper Red Rock Lake. (*Id.* at 6.)  This population goal was believed to ensure the "long-term self-sustaining persistence" of the Centennial Valley population going forward. (*Id.* at 6–7.)  The Adaptive Management Plan identified a number of factors that negatively bear on the abundance of Arctic grayling, including a decline in spawning habitat, competition or predation by other native and nonnative fish, and limited winter habitat. (*See id.* at 9–10.)

The primary winter habitat for Arctic grayling within this drainage is Upper Red Rock Lake, (Doc. 7-5 at 4), and the population "has undergone significant declines in abundance in recent years," (*id.* at 7).  The agency has identified "[h]igh winter mortality of grayling within Upper [Red Rock] Lake during periods of hypoxia (low dissolved oxygen) . . . as the primary limiting factor for grayling in the Centennial Valley." (*Id.* at 4.)  Low-oxygen conditions during the winter occur when deep snow covers the ice on the shallow lake, blocking the "sunlight that is used by aquatic plants to photosynthesize." (Doc. 7-4 at 115.)  This causes

4

aquatic plants to die, which both prevents those plants from creating more oxygen and consumes oxygen through the decomposition process. (*Id.*) The Service has therefore pursued action to "improve the amount of deep, well oxygenated under-ice habitat in Upper [Red Rock] Lake for wintering grayling." (Doc. 7-5 at 7.) Suitable overwinter habitat for grayling in Upper Red Rock Lake is greater than 4 parts per million ("PPM") of dissolved oxygen" and water "greater than 1 meter deep." (*See* Doc. 23-1 at ¶ 16.)

Notably, despite consistently low population numbers, the Arctic grayling is not listed as threatened or endangered under the Endangered Species Act ("ESA"). Indeed, in its most recent 2020 "12-Month Finding," the Service concluded that "it is not warranted at this time to list the Upper Missouri River [distinct population segment] of [A]rctic grayling." (Doc. 7-4 at 1, 187; *see also id.* at 2–8 (discussing history of ESA review and related litigation).)

## II.   Agency Action

Between 2017 and the present, the Service pursued a number of different management strategies to address winter oxygenation levels in Upper Red Rock Lake. For example, during the winters of 2020–21 and 2021–22, the Service implemented water releases from Widgeon Pond. (Doc. 7-5 at 11; Doc. 7-10 at 2.) The Service also engaged in the "notching" of beaver dams each spring prior to spawning, which "removes a portion of existing beaver dams to ensure grayling

have access to upstream spawning areas." (Doc. 7-5 at 12.) And, during the 2023

winter season, the Service installed an electric-powered diffuser aerator on the lake

surface as a pilot test for the potential efficacy of a larger-scale diffuser

installation. (*See* Doc. 7-1 at 3.)

In February 2023, the Service issued a draft Environmental Assessment

("EA"), identifying the following six alternative actions:

| Alternative | Description |
| --- | --- |
| A – No Action | "[C]urrent management strategies, including water releases from Widgeon Pond into [Upper Red Rock Lake], beaver dam notching, and seasonal fishing closures, would continue." |
| B – Electric Powered Splashers or Diffusers | "[W]ould implement the use of electric powered splashers or diffusers to increase oxygen levels in [Upper Red Rock Lake] and improve winter habitat for grayling." |
| C – Electric Generators with Pumped Aeration | "[W]ould use an electrical pump connected to high-density polyethylene (HDPE) pipeline to extract deoxygenated water from [Upper Red Rock Lake] and transfer that water to a land-based aerator . . . , which is then pumped back into [the Lake] at a separate location." |
| D – Shambow Pond Diversion Pipeline | "[W]ould use a buried, gravity flow diversion pipeline to deliver oxygenated water to [Upper Red Rock Lake] during winter months to improve conditions for grayling." |
| E – Permanent Barrier from Elk Springs creek to the Lake Center | "[T]he Refuge would construct a permanent wall of sheet piling or similar material . . . to direct the dominant flow of oxygenated water from Elk Springs Creek into the center of the lake." |
| F – Dredge and Berm Elk Springs Creek | "[W]ould use a shallow floating dredge to remove sediments near the mouth of Elk Springs Creek." |

(*See* Draft EA[1] at 10–14; Doc. 7-5 at 11–15.)  In May 2023, the Service issued a

Final EA, (*see* Doc. 7-5), and on June 1, 2023, published a "Finding of No

Significant Impact and Decision to Implement Conservation Efforts for Arctic

Grayling" or "FONSI" selecting Alternative D, (*see* Doc. 7-1).  Under this

alternative, a gravity diversion pipeline would deliver approximately 2 cubic

feet/second of oxygenated water during winter months from East Shambow Creek

and Shambow Pond to the center of Upper Red Rock Lake.  (*Id.* at 1.)  "The

pipeline would be 5,300 ft in total length, with 3,300 ft on land and the remaining

2,000 ft in [Upper Red Rock Lake]." (*Id.*)  The pipeline would be installed in a

4,700 feet long trench that is approximately 2 feet wide by 6 feet deep.  (*Id.* at 4.)

"Visible infrastructure will include a vault (20in x 6in x 16in) on the north side of

the lake to control flow, some minor infrastructure (below 8in in height) near

Shambow Pond, and multiple cleanouts along the pipeline.  All would be at ground

level and placed in such a way that natural topography would reduce the visibility

of any structures." (*Id.* at 1–2.)  Additionally, the existing Widgeon Pond releases,

beaver dam notching, and fishing closures would continue.  (*Id.* at 2.)

---

[1] The Draft EA was not filed by the parties and is therefore not in the preliminary
injunction record.  The version cited here was obtained from the Service's website,
https://www.fws.gov/media/drafteaupperredrocklakegraylingfinal508c22423pdf
(accessed June 29, 2023).  *See* Fed. R. Evid. 201(b)(2).

Although the Service's wilderness review contemplates a six-month construction period, (*see* Doc. 7-10 at 78), the agency has indicated that construction is expected to last two months, with ground-breaking activity beginning as soon as August 15, 2023, (*see* Doc. 19-5 at ¶¶ 2–3). The Service has further stated that any delay of that start date risks the project not proceeding this year because of the onset of winter. (*See id.* at ¶¶ 4, 6.)

## III.  Current Litigation

On June 26, 2023, Plaintiffs filed the present action, alleging that the Shambow Pond pipeline (Claim 1), the Widgeon Pond diversion (Claim 2), the beaver dam notching (Claim 3), and the Upper Red Rock Lake diffuser installation (Claim 4) violate the Wilderness Act . (*See* Doc. 1.) Plaintiffs seek preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, asking the Court to enjoin the Service from undertaking any project activity during the pendency of this action. (Doc. 6.) That request is opposed by both the Service, (*see* Doc. 19), and the Montana Department of Fish, Wildlife and Parks ("Montana Fish, Wildlife and Parks"), who intervened as a matter of right on July 19, 2023, (Docs. 22, 23).

## ANALYSIS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To

succeed on their request, Plaintiffs must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. The Ninth Circuit applies a sliding scale test to these factors: if Plaintiffs can at least raise "serious questions going to the merits" and demonstrate that the "balance of hardships tips sharply toward[] [them]," Plaintiffs are entitled to preliminary injunctive relief "so long as . . . [they] also show[] that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Because Plaintiffs have met this burden here, their request for preliminary injunctive relief is granted.

## I.    Likelihood of Success

Plaintiffs' Wilderness Act claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq. See Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003). Under the APA, a "reviewing court shall hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the administrative record demonstrates that the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, the scope of judicial review is narrow and a court should "not substitute its judgment for that of the agency." *Id.*

Here, Plaintiffs argue that the Service's approval of the proposed action "displays all the hallmarks" of an APA violation because it ignored the substantive mandates of the Wilderness Act, allowing prohibited activities in a wilderness area in pursuit of the questionably efficacious goal of increasing oxygenation levels in Upper Red Rock Lake for the Arctic grayling. (Doc. 26 at 11.) In response, the Service argues that Plaintiffs lack standing and that, even if they could proceed on the merits, Plaintiffs are not likely to succeed as the proposed action complies with the Wilderness Act's allowance of otherwise prohibited activities for conservation purposes. Ultimately, Plaintiffs have shown that they have standing at this stage of the proceeding and have raised serious questions going to the merits of their claims. *Alliance for the Wild Rockies*, 632 F.3d at 1135.

## A.    Standing

The Service first argues that Plaintiffs have not met their burden of establishing Article III standing. To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct

of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The plaintiff, as the

party invoking federal jurisdiction, bears the burden of establishing these

elements." *Id.* "Where, as here, a case it at the pleading stage, the plaintiff must

clearly allege facts demonstrating each element." *Id.* (internal quotation marks and

alternation omitted).

The Service challenges Plaintiffs' ability to meet the first element, injury in

fact. "To establish standing, a plaintiff must present an injury that is concrete,

particularized, and actual or imminent." *Ctr. for Biological Diversity v. Bernhardt*,

946 F.3d 553, 559–60 (9th Cir. 2019). "Conjectural, hypothetical, or speculative

injuries . . . do not suffice." *Id.* Here, in support of their original motion, Plaintiffs

provide a single declaration from George Nickas, the Executive Director of

Plaintiff Wilderness Watch.[2] (*See* Doc. 7-2.) The Service is critical of that

declaration insofar as Nickas does not state that he will visit the area during

construction and "does not explain how he would be injured by a buried pipeline

and its minimal associated infrastructure with only temporary impacts to

wilderness." (Doc. 19 at 21.) Not so. Contrary to the Service's characterization,

---

[2] Plaintiffs attached additional declarations to their reply brief. (*See* Docs. 26-1, 26-2.) While these declarations strengthen Plaintiffs' case for standing, the defendants did not have an opportunity to respond to them and thus they are not considered here in light of the conclusion that Nickas's Declaration, on its own, is sufficient to show injury-in-fact at this stage.

the Project will not only involve temporary construction activities including

mechanical transport, motorized equipment, motor vehicles, motor boats, and

temporary roads for a period of up to six months, but it will also permanently alter

the landscape with a visible vault structure and "multiple cleanouts." (*See* Doc. 7-

10 at 78.)  In so doing, the Project will permanently modify the wilderness

character of the area, impacting Plaintiffs' use and enjoyment both during and after

the construction of the pipeline.  (*See* Doc. 7-2 at ¶ 10.)  Thus, Plaintiffs have

adequately alleged standing.

> **B.  Merits**

The crux of Plaintiffs' claim is that the Service's proposed action fails to

preserve "the wilderness character of the area," in violation of the Wilderness Act.

*See* 16 U.S.C. § 1133(b).  Indeed, under the Act, the Service is "responsible for

preserving the wilderness character of an area."  *Id.*  Nevertheless, the Service

must, at the same time, "administer such area for such other purposes for which it

may have been established as also to preserve its wilderness character."  *Id.*

Congress has identified those purposes as "recreational, scenic, scientific,

educational, conservation, and historical use."  *Id.*  Accordingly, the Act prohibits

the construction of roads, the use of motorized vehicles and mechanical equipment,

and installations or structures "except as necessary to meet the minimum

requirements for the administration of the area for the purpose of this chapter."  *Id.*

§ 1133(c). Consistently, to invoke this exception, an agency must first identify a valid "purpose" under the Act. *Wilderness Watch, Inc. v. U.S. Fish and Wildlife Serv. ("Kofa")*, 629 F.3d 1024, 1032 (9th Cir. 2010). It must then show that the prohibited activity is "necessary" to meet the "*minimum* requirements for the administration of the area" for that identified purpose. *Id.* at 1037. Here, the Service insists that the Project fits within § 1133(c) because it meets the elements set out in *Kofa*. Plaintiffs disagree, ultimately raising serious questions whether the Service's approval of the Project violated the APA.

### 1.    Conservation

The Wilderness "Act gives conflicting policy directives to the Service in administering [a wilderness] area" as it is simultaneously charged with "maintaining the wilderness character" and "devoting the land to conservation." *Kofa*, 629 F.3d at 1033. And because the term "conservation" is ambiguous under the Act, courts apply what is known as *Skidmore* deference in reviewing the agency's identification of a conservation "purpose" in this context. *Id.* at 1035 (referencing the standard set out in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). "Under that standard, the deference to be accorded depends on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to

persuade, if lacking power to control." *Id.* (internal quotation marks and alteration omitted).

The Ninth Circuit's decision in *Kofa* provides useful guidance in this context. In *Kofa*, the Service decided to construct two water tanks for declining bighorn sheep populations within the Kofa National Wildlife Refuge and Wilderness in southwest Arizona. *Id.* at 1026. Although the court determined that the Service properly identified conservation of bighorn sheep as a valid purpose under the Wilderness Act, *see id.* at 1035–36, the court concluded the Service failed to explain that the "water structures were necessary at all" where the record showed a multitude of strategies not prohibited by the Wilderness Act could have improved bighorn sheep populations, *id.* at 1037–39. As it relates to the identification of the "conservation" purpose, the court focused on the fact that the Kofa area was historically protected for the express purpose of conserving bighorn sheep, which was then reflected in the designation of the wilderness area and the Service's subsequent management decisions. *See id.* at 1035–36.

The Service insists that the record here, like *Kofa*, shows consistent efforts to conserve Arctic grayling populations in the establishment and management of the Red Rock Lakes Wildlife Refuge and Wilderness. Although the Service may overstate the historical record, it has adequately supported the identified conservation purpose.

14

In the original establishment of the Refuge in 1935, President Roosevelt's executive order made only a general reference to "a refuge and breeding ground for wild birds and animals." (*See* Doc. 7-5 at 5.) And, other records from that time emphasize the area's specific value for waterfowl conservation, specifically the trumpeter swan. (*See* Doc. 7-6 at 4; Doc. 19-1 ("Historically, management focused on protecting and enhancing the trumpeter swan population at the refuge.").) There is no contemporaneous mention of the Arctic grayling, and the Service's subsequent approach to the Arctic grayling is mixed. According to a 2009 Service document, a 1941 Service letter stated that "the streams on Red Rock Lakes Refuge are some of the most important grayling streams in the United States, and it is the desire of the Division of Wildlife Refuges to preserve these streams for this purpose." (Doc. 19-1 at 31.) Similarly, a 1952 letter "from the state of Montana to the Service describes the Red Rock drainage, which flows through the refuge, as a grayling sanctuary where all steps possible would be taken to preserve this unique population of grayling." (*Id.*) However, throughout the 1900s, the Service took actions that were detrimental to the grayling in the Refuge, such constructing dams that limited grayling movement and spawning. (*See* Doc. 7-6 at 4–5.) And while the 1976 Wilderness designation specifically identified the existence of grayling habitat, (*see* Doc. 19-2 at 6 ("These waters are also habitat for the grayling, which is a threatened species."), the focus remained on restoration of the trumpeter swan,

(*see id.* ("This Refuge has played a significant role in restoring trumpeter swan populations from near extinction.").)  Thus, the weight of the historical record does not show consistent conservation efforts.

Nevertheless, while Arctic grayling may not have always been a priority for the Service, recent history show efforts to conserve the Centennial Valley grayling population.  The strongest support for the Service's conservation theory appears in the 2009 Comprehensive Conservation Plan.  (*See* Doc. 19-1.)  While that document once again emphasizes that the area was originally intended to aid in the restoration of the trumpeter swan, (*id.* at 29–30, 35), it goes on to state that "[t]here is also a remnant population of endemic adfluvial (a population that lives in a lake and breeds in a river) Arctic grayling that occur on the refuge," (*id.* at 7–8).  It then makes general reference to fishery conservation, (*id.* at 8 (indicating the legislative purposes of the Refuge include "the development, advancement, management, conservation, and protection of fish and wildlife resources"), and identifies "maintaining one of the last known endemic populations of adfluvial Arctic grayling" as a "key issue[]," (*id.* at 9).  To this end, the Plan states that the Refuge "has one of the only endemic adfluvial populations of Arctic grayling in the contiguous United States" and that this population is "imperiled due to a significant loss of habitat, disease, and impacts from other nonnative fish species." (*Id.* at 22.)  The Plan further states that in order to achieve the "objective of

restoring declining fish populations, the refuge will need to take management actions to enhance th[is] species and [its] habitat[], while ensuring the purposes of the refuge are being met." (*Id.*; *see also id.* at 40 (identifying a concern over low spawning numbers).) Arctic grayling are then identified as a "management focus," (*id.* at 79), with specific objectives set for restoring spawning and riparian habitat, restoring spawning populations, and removing nonnative fish, (*id.* at 83–84, 87–88). The Service subsequently issued the 2017 Adaptive Management Plan "to elucidate the relative effect of hypothesized drivers of [Centennial Valley] grayling abundance to direct future management of the population." (Doc. 7-7 at 2.)

Plaintiffs insist, however, that the Service's goal population of 1,000 fish is not supported by historical management efforts and that the fact that Arctic grayling has not been listed under the ESA as an endangered or threatened species undermines its identification as a conservation purpose here. But neither argument is fatal to the agency's position. Plaintiffs' disagreement with the Service's specific population goal presents a definitional dispute over what it means to have successfully achieved the identified purpose; it does not challenge the validity of that purpose under the terms of the Wilderness Act. As it relates to the second challenge, while Plaintiffs are correct that the Service recently determined that listing is not warranted, (*see* Doc. 7-4), the conservation goals of an agency under the Wilderness Act are not concomitant with the ESA. *See Kofa*, 629 F.3d 1036

17

(affirming the Service's determination that conservation of bighorn sheep is consistent with the purpose of the Wilderness Act despite the fact that bighorn sheep are not protected under the ESA). It is interesting, however, that the Service has chosen to elevate the Centennial Valley grayling population over all other wilderness purposes while simultaneously taking the position that this distinct population segment is neither important enough nor imperiled enough to be listed. (*See* Doc. 7-4.)

Ultimately, it is appropriate to defer to the Service's interpretation in the EA and FONSI that conservation of Arctic grayling is consistent with the purposes of the Wilderness Act. Montana Fish, Wildlife and Parks argues that if that is the case, "the Court need go no further." (Doc. 23 at 4.) Not so. As discussed below, prohibited activity within a wilderness area—such as the construction of a permanent pipeline—is permitted only if both necessary and the minimum required to achieve the purpose of the Act. *See* 16 U.S.C. § 1133(c); *Kofa*, 629 F.3d at 1037.

### 2. Necessary to Meet the Minimum Requirements

The Wilderness Act prohibits motorized use or the development of any structure within a wilderness area "except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter." 16 U.S.C. § 1133(c). Because the conservation of Arctic grayling is likely a valid

purpose under the Act, the relevant inquiry is whether the Service made an adequately reasoned determination that the proposed pipeline structure and associated prohibited activity is "necessary to meet the minimum requirements" for the administration of the Red Rock Wilderness for that purpose. *See Kofa*, 629 F.3d at 1036, 1039; *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 646 (9th Cir. 2004) ("It is clear that the statutory scheme requires, among other things, that the [agency] make a finding of 'necessity' before authorizing [otherwise prohibited activity] in a wilderness area."). While the Wilderness Act "does not specify any particular form or content for such an assessment" and courts "must defer to the form selected by the agency," a "generic finding of necessity does not suffice." *Kofa*, 629 F.3d at 1036–37 (internal quotation marks and emphasis omitted).

Here, the Service insists that it has complied with the Wilderness Act based on the analysis provided by the agency in its "Minimum Requirements Decision Guide Workbook." (*See* Doc. 7-10.) In response, Plaintiffs argue that the Service acted arbitrarily and capriciously because it approved the Project despite recognizing that it may not actually prevent degradation of the Centennial Valley grayling population and that it would actually diminish the area's wilderness character. Plaintiffs further highlight the Service's failure to consider alternatives for conserving the Arctic grayling that would not require prohibited activities under the Wilderness Act. Ultimately, Plaintiffs have raised serious questions

19

whether the Service violated the APA by offering an explanation counter to the

evidence or failing to consider an important aspect of the problem. *State Farm*,

463 U.S. at 43.

The Ninth Circuit's decision in *Kofa* once again provides useful guidance

here. In *Kofa*, the court concluded the Service did not justify its underlying

assumption because it failed to explain that the "water structures were necessary at

all" for the conservation of the bighorn sheep. *Id.* at 1037–39. Like in *Kofa*,

Plaintiffs argue that the Service's decision to implement the Shambow Pond

pipeline is arbitrary and capricious because the Service failed to justify why

artificially adding oxygen to Upper Red Rock Lake was compatible with the

Wilderness Act, let alone how to effectively do so. According to Plaintiffs, the

Service's subsequent analysis all flows from this unsupported assumption.

In *Kofa*, the court conceded that "[t]here is little question that improvements

to the water supply likely will help the sheep recover." 629 F.3d at 1039. But

here, the Service's simulation of dissolved oxygen levels in Upper Red Rock Lake

across the alternatives shows almost no change between all six options, including

the "no action" alternative, (Doc. 7-9 at 46), and almost no difference in the

predicated abundance of Arctic grayling under each alternative going forward, (*id.*

at 50). To the contrary, the Technical Report the agency completed in support of

its Wilderness impacts decision states that the "[l]ikelihood of recovery is low

under" most of the alternatives, including the proposed pipeline. (*See id.* at 48–
49.)  That said, Matt Jaeger, a biologist from Montana Fish, Wildlife and Parks
insists that project implementation reduces the extinction probability, (*see* Doc. 23-
1 at ¶ 34 (citing Doc. 7-10 at 49, Table 3)), arguing that "because alternative D
always improves the amount of winter habitat relative to the status quo, predicted
grayling abundance would always be larger and risk of extinction lower if
alternative D were implemented under a given set of background conditions," (*id.*
¶ 36).  But to say that an action *may* achieve a conservation purpose in a wilderness
area is not the same as saying it is *necessary* to that goal.

Despite this disconnect, the Service's wilderness analysis synonymizes
avoiding extirpation of the species with the installation of the pipeline.  The
Workbook states that "[t]his population of endemic Arctic grayling is important to
the Natural Wilderness Character Quality.  Extirpation of this rare, endemic
adfluvial population would degrade the Natural Wilderness Character Quality."
(Doc. 7-10 at 4.)  However, the Workbook also states: "There is an assumption the
population may become extirpated unless dissolved oxygen is enhanced," (*id.* at 1),
and "delays in determining a suitable conservation measure could lead to
extirpation of this rare, endemic Arctic grayling population," (*id.* at 8).  This is not
the unequivocal conclusion implied by the agency in the briefing.  Although
undisputedly touting the dangers of extirpation, nowhere does the Workbook show

that the proposed pipeline structure is necessary to avoid that outcome. *See Californians for Alternatives to Toxics v. U.S. Fish & Wildlife Serv.*, 814 F. Supp. 2d 992, 1019 (E.D. Cal. 2011) ("[T]he necessity lies in the use of the otherwise prohibited activity, here the use of motorized equipment [and the installation of a permanent structure], and not the merits of the proposed project."). Contrary to the Service's briefing, necessity of the specific prohibited activity cannot be presumed from the validity of the overarching goal of restoring the Arctic grayling. *See id.*

During oral argument, the Service downplayed its uncertainty, emphasizing the scientific method behind its adaptive management approach. In brief, the agency described adaptive management as the process of reducing uncertainty within a complex system while determining how the system operates and how different variables affect it. This process starts by making a hypothesis for each modeled variable. The agency then conducts experiments to assess the validity of the modeling when compared with real world outcomes. Here, according to the Service, the winter habitat model was the most strongly supported by the data in the field. But, as conceded by the Service and Montana Fish, Wildlife and Parks at the hearing, prior oxygenation efforts have all been unsuccessful and real-world impacts have not lined up with the agency's modeling estimates. (*See also* Doc. 7-5 at 8.) Rather, the record indicates that the agency is experimenting with a new management approach that it thinks will work, but is likely not a final solution.

(*See* Doc. 7-9 at 50.)  And even if such an "adaptive" approach will help to conserve Arctic grayling in the short term, it not clear that it comports with the Wilderness Act.

But even if the proposed action would be effective or it was appropriate for the Service to engage in adaptive management in a wilderness area, Plaintiffs have raised a serious question whether the proposed action complies with the substantive requirements of the Wilderness Act in light of the agency's own analysis of its negative impacts.  As indicated above, the Workbook states that "[t]his population of endemic Arctic grayling is important to the Natural Wilderness Character Quality.  Extirpation of this rare, endemic adfluvial population would degrade the Natural Wilderness Character Quality."  (Doc. 7-10 at 4.)  Stated in the inverse then, the Service is correct that the Workbook connects conservation of the Arctic grayling with one of the five Wilderness Character Qualities, i.e., "Natural Wilderness Character."  But qualifying language permeates the Workbook:

- "Administrative action that improves the Natural Wilderness Character Quality *without degrading other Wilderness qualities may be necessary*," (*id.* at 4 (emphasis added));

- "Conserving this population *without disturbing or disrupting the abundance or distribution of plant or animal species would benefit the Natural Wilderness Character Quality*," (*id.* at 6 (emphasis added));

- "Preserving the Natural Wilderness Character while significantly degrading the Untrammeled, Undeveloped, and Outstanding Opportunities for Solitude or Primitive and Unconfined Recreation Wilderness Character Qualities *would not be consistent with the Act*," (*id.* (emphasis added)).

The Workbook further explains that the proposed action does not meet any of the other necessity criteria, such as "to satisfy valid existing rights or a special provision in wilderness legislation," (*id.* at 2), "to meet the requirements of other federal laws," (*id.* at 3), or to preserve any of the other four Qualities of Wilderness Character: "Untrammeled," "Undeveloped," "Solitude or Primitive & Unconfined Recreation," or "Other Features of Value," (*id.* at 3–5). (*See generally id.* at 6.) The Workbook shows that each of the alternatives, including selected Alternative 5 (or Alternative D), would negatively affect most of the Wilderness Character Qualities:

Project Title: Alternatives to conserve Arctic grayling

### MRDG Step 2: Alternative Comparison

Alternative 1:   Water releases, beaver dam notching, limited angling closures

Alternative 2:   Splasher Aeration

Alternative 3:   Diffuser Aeration

Alternative 4:   Aerator with Recirculating Pump and Pipelines

| Wilderness Character | Alternative 1 | | Alternative 2 | | Alternative 3 | | Alternative 4 | |
|---|---|---|---|---|---|---|---|---|
| | Positive | Negative | Positive | Negative | Positive | Negative | Positive | Negative |
| Untrammeled | 0 | 2 | 0 | 3 | 0 | 3 | 0 | 3 |
| Undeveloped | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 4 |
| Natural | 3 | 1 | 4 | 4 | 4 | 4 | 4 | 4 |
| Solitude/Primitive/Unconfined | 0 | 2 | 0 | 6 | 0 | 5 | 0 | 5 |
| Other Features of Value | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 3 | 5 | 4 | 17 | 4 | 16 | 4 | 16 |
| Wilderness Character Rating | -2 | | -13 | | -12 | | -12 | |

Alternative 5:   Shambow Pond Diversion Pipeline

Alternative 6:   Permanent Barrier from Elk Springs Creek to Lake Center

Alternative 7:   Elk Springs Creek Dredge and Deflection Berm

Alternative 8:

| Wilderness Character | Alternative 5 | | Alternative 6 | | Alternative 7 | | Alternative 8 | |
|---|---|---|---|---|---|---|---|---|
| | Positive | Negative | Positive | Negative | Positive | Negative | Positive | Negative |
| Untrammeled | 0 | 4 | 0 | 3 | 0 | 4 | 0 | 0 |
| Undeveloped | 0 | 3 | 0 | 4 | 0 | 4 | 0 | 0 |
| Natural | 4 | 4 | 4 | 5 | 4 | 5 | 0 | 0 |
| Solitude/Primitive/Unconfined | 0 | 5 | 0 | 6 | 0 | 6 | 0 | 0 |
| Other Features of Value | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 4 | 16 | 4 | 18 | 4 | 19 | 0 | 0 |
| Wilderness Character Rating | -12 | | -14 | | -15 | | 0 | |

(*Id.* at 74–75; *see also id.* at 41–48 (specific discussion of Alternative 5).)  As a

result, the Service itself concluded that the proposed action would have a net

negative effect on the Wilderness Character rating for the area.

The Service insists that the negative effects comply with the Wilderness Act

because such project is necessary to conserve the Centennial Valley grayling and

any of the more effective options, identified as Alternatives 6 and 7, have too great

an impact on the wilderness character.  (*See id.* at 75.)  But the question is not

simply whether the agency met certain procedural requirements in analyzing the

impacts of the Project under the Wilderness Act; rather, the Wilderness Act imposes substantive limits on wilderness management that require preservation of an area's "wilderness character." It cannot be reduced, as phrased by Plaintiffs, to mere "paperwork hurdles." Put simply, the agency concluded that the Project would have a detrimental effect on the area's wilderness character—a conclusion inconsistent with § 1133(b)—but approved it anyway.

At oral argument, both the Service and Montana Fish, Wildlife and Parks insisted that Plaintiffs are overstating the "natural" state of area, as the historical record shows consistent human alterations to the Centennial Valley dating as far back as the construction of the Lima Dam in the late 1800s. (*See* Doc. 7-5 at 9.) They also emphasized that directly outside the wilderness boundary, on the banks of Upper Red Rock Lake, are a number of campgrounds, and roads, and that there is even a nearby airport. (*See* Doc. 23-2.) According to the Service and Montana Fish, Wildlife and Parks, the current project would help restore the area to its pre-intervention state and would not degrade an already "trammeled" landscape. But, as argued by Plaintiffs, while these arguments may be logical from a management approach, they do not account for the strict limitations of the Wilderness Act, under which the area now falls. *Greater Yellowstone Coal. v. Timchak*, 2006 WL 3386731, at *6 (D. Idaho Nov. 21, 2006) ("If the land at issue was typical National Forest property, the Forest Service's careful analysis would be commendable.").

For land within a wilderness area, "the Act abides no diminishment, however much [of the wilderness] is left." *Id.* And that Act "must guide all decisions as the first and foremost standard of review for any proposed action." *Id.* Accordingly, a proposed action in a wilderness area must be justified on the basis of wilderness necessity, not project necessity.

Finally, the agency must provide a reasoned discussion of alternatives that may avoid prohibited activity under the Wilderness Act. As explained in *Kofa*, "[j]ust because a particular variable affects the sheep's viability, the Service is not free to create structures addressing that variable without regard to any other variables at play." 629 F.3d at 1039. "[T]he Service must, at the very least, *explain* why addressing one variable is more important than addressing the other variables and *explain* why addressing that one variable is even necessary at all, given that addressing the others could fix the problem just as well or better." *Id.* If addressing other variables will lead to similar results, "then a new structure is not 'necessary.'" *Id.*

Here, the Service concedes in its final EA that "[c]ompeting hypotheses made it difficult to identify which factors were most important to address and which actions would be most likely to reverse the population decline." (Doc. 7-5 at 8.) In that vein, the Service focused on the following factors as the most important: (1) quality and quantity of spawning habitat, (2) predation by and

27

competition with non-native Yellowstone cutthroat trout, and (3) quality of overwinter habitat. (*Id.*) The Service then used modeling to test management activities related to these three factors and, according to the Service, the Centennial Valley grayling population remained "critically low" despite efforts made to address (1) and (2). (*Id.*) Accordingly, the agency turned to (3), concluding that the most supported hypothesis is that "[w]inter habitat [i]s the primary limiting factor for the [Centennial Valley] grayling population." (*Id.*) That conclusion, however, is immediately followed by an extensive discussion of *other* factors that have limited Arctic grayling connectivity in the area. (*See id.* at 8–9 (*e.g.*, dams and irrigation practices).)

Additionally, in responding to Plaintiffs' current motion, Montana Fish, Wildlife and Parks provided a declaration from one of its biologists explaining why angler activity, increased summer temperatures, egg introduction into Elk Springs Creek, riparian grazing, and electrofishing monitoring are not scientifically defensible alternatives and were therefore not discussed in the EA. (*See* Doc. 23-1.) But in order for the agency to have considered all the important factors, such analysis must be part of the administrative record. It is generally not appropriate to provide a post hoc explanation for why certain alternatives or issues were not addressed. This concern has been borne out here, where Plaintiffs argue that the Service ignored a number of other potential factors, such as liberalized spring

fishing in tributary streams.  (*See* Doc. 7-5 at 84–89 (comments to agency from

former Red Rock Lakes National Wildlife Refuge manager).)  Although Montana

Fish, Wildlife and Parks insists that these other factors were not considered in

depth because they were not scientifically defensible alternatives, (*see* Doc. 23-1 at

¶ 28), it is not clear that that conclusion is adequately supported in the agency

record.

Ultimately, in light of the Wilderness Act's strict requirements, the mere

*possibility* that the proposed action may aid in Arctic grayling conservation is not

enough to create *necessity.  See Kofa*, 629 F.3d at 1039 (explaining that the fact

that action will aid in achieving the goal is not concomitant with finding that action

is necessary to the goal).  That is especially so where the proposed action will have

a negative impact on the area's wilderness character and involve most of the

activities prohibited by the Act, including mechanical transport, motorized

equipment, motor vehicle, motorboats, and temporary roads, as well as the

permanent installation of a structure.  (Doc. 7-10 at 78.)  Plaintiffs have raised a

serious question whether the Service entirely failed to consider an important aspect

of the problem or offered an explanation for its decision that runs counter to the

evidence when it determined that the construction of the proposed pipeline

structure is "necessary to meet minimum requirements for the administration of the

area."  16 U.S.C. § 1133(c).  The Service itself has recognized that all proposed

actions, including the purported "no action" alternative, would diminish the area's wilderness character, (*see* Doc. 7-10 at 74–75; *see also id.* at 41–48 (specific discussion of Alternative 5)), and that "significant[] degrad[ation]" of the wilderness "would not be consistent with the Wilderness Act," (*id.* at 6).

### 3.    "No Action" Activities

Although not emphasized by either party at the preliminary injunction hearing, Plaintiffs' claims go beyond the pipeline itself, challenging the continued diversion from Widgeon Pond (Claim Two), beaver dam notching (Claim Three), and the diffuser installation on Upper Red Rock Lake (Claim Four).  (Doc. 1 at ¶¶ 112–20.)  As recognized by the Service, these activities are also anticipated to degrade the wilderness character of the area.  (*See* Doc. 7-10 at 9–16, 25–32.)  But more importantly, the Service and Montana Fish, Wildlife and Parks have repeatedly and unequivocally stated that these efforts are not working.[3]  Thus, to the extent these actions involve prohibited activities and are occurring within the wilderness area, Plaintiffs have also raised serious questions whether their approval complied with the APA and the Wilderness Act.

## II.    Irreparable Harm

---

[3] At the hearing, Montana Fish, Wildlife and Parks explained that the Widgeon Pond release did not work because the oxygen did not reach the middle of Upper Red Rock Lake and the diffusers did not work because the oxygen did not get deep enough.

In order to obtain a preliminary injunction, a plaintiff must allege more than the possibility of harm. *Winter*, 555 U.S. at 22. A plaintiff must demonstrate that absent such an order, irreparable harm is *likely*. *Id.* "Ongoing harm to the environment constitutes irreparable harm warranting an injunction. When a project may significantly degrade some human environmental fact, injunctive relief is appropriate." *Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (quotation marks and citation omitted).

Here, Plaintiffs allege that their members "face an imminent threat of injury to their environmental, recreational, scientific, aesthetic, and spiritual interests in the wilderness character of Red Rock Lakes should the project's construction proceed." (Doc. 7 at 31 (citing Doc. 7-2 at ¶¶ 7–11).) The Service argues that Plaintiffs fail to show irreparable harm because (1) they delayed in filing suit and (2) the alleged disturbance is tied primarily to the construction of the pipeline, which is temporary "as reclamation of the original state is anticipated and the permanent structures associated with the pipeline would be de minimis." (Doc. 19 at 30.) Plaintiffs have the better argument.

As it relates to delay, there is no dispute that Plaintiffs were aware of the Project and its possible consequences in late 2022 and early 2023. (*See* Doc. 7-5 at 54, 90–94, 101–05 (comments on draft EA).) However, because the APA only permits challenges to "final agency action," Plaintiffs were not able to sue until the

decision-making process was complete and the FONSI issued.  *See* 5 U.S.C. § 704; *Navajo Nation v. Dep't of Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017).  Thus, any delay before June 1, 2023 is not the fault of Plaintiffs. The Service is correct, however, that Plaintiffs waited an additional 25 days to file suit.  (*See* Doc. 1.) Nonetheless, Plaintiffs contacted the Service on June 20—19 days after the Service's decision—to determine when construction would begin and filed both their Complaint and a motion for preliminary injunctive relief within five days of getting a response.  (*See* Doc. 7-2 at ¶ 14); *Alliance for the Wild Rockies v. Gassmann*, 604 F. Supp. 3d 1022, 1036 (D. Mont. 2022) (rejecting a similar delay claim where the environmental plaintiff filed its motion "a mere nine days" after the defendant noticed a start date for project activity).  This is not the situation where Plaintiffs idly sat by.

The Service's argument regarding the "temporary" nature of the alleged injury is equally unpersuasive.  While the construction activities related to the pipeline are transitory, the proposed action involves mechanized construction activity in a wilderness area and the installation of a permanent structure. Accordingly, the harms alleged by Plaintiffs are fundamentally qualitative, noncompensable injuries to a limited natural resource. *See Wilderness Watch v. Vilsack*, 229 F. Supp. 3d 1170, 1183 (D. Idaho 2017) ("[P]laintiffs' interest in the

wilderness character of the Wilderness Area is real and cannot be compensated for by a monetary award.")  Plaintiffs have therefore shown irreparable harm.

## III.   Balance of Equities and Public Interest

Under the "balance of the equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (quotation marks omitted).  The public interest inquiry, by contrast, "primarily addresses impact on non-parties rather than parties."  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).  When the government is a party, the analyses on the final two elements merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  As argued by Plaintiffs, "Congress has recognized through the passage of the Wilderness Act . . . that there is a strong public interest in maintaining pristine wild areas unimpaired by man for future use and enjoyment" and that protecting this interest "weighs in favor of equitable relief."  *High Sierra*, 390 F.3d at 643.

The Service's primary argument is that Plaintiffs' proposed injunction would have a significant negative impact on the Arctic grayling population: "If the proposed pipeline is not built to improve winter habitat for the grayling, then the population is likely to degrade further."  (Doc. 19 at 33.)  Yet, as discussed above, the record is mixed as to whether the proposed action will mitigate this concern.

Additionally, the 2022 Adaptive Management Project Annual Report indicates that the spawning population for 2022 (73 fish) is "statistically similar to the previous year." (Doc. 19-4 at 1.) That same report goes on to describe the population abundance as "*consistently* low" since 2016. (*Id.* at 2 (emphasis added).) Yet those "low" numbers exceed the extirpation threshold identified in the agency's Technical Report, which states that the population is considered extirpated "when the adult population drops below 25 individuals for at least one year." (Doc. 7-9 at 8.) Nor is the alternative extirpation threshold met, which requires a drop below 50 individuals for three consecutive years. (*See id.* at 8–9.) Rather, the declaration of James Boyd, a Listing and Recovery Fish and Wildlife Biologist with the Service, merely states that that further delay would "result in another year of low Arctic grayling abundance." (Doc. 19-6 at ¶ 9.) In the absence of more specific exigency, the impact on the Arctic grayling is sharply outweighed by the threat of a permanent alteration of a wilderness area. *See* 36 C.F.R. § 293.2 ("In resolving conflicts in resource use, wilderness values will be dominant to the extent not limited by the Wilderness Act, subsequent establishing legislation, or the regulations in this part."). That is especially so insofar as the Service itself has acknowledged that "further study" is necessary to determine if the proposed action will actually solve the problem. (*See* Doc. 7-10 at 2, 77.)

34

The Service further argues that a preliminary injunction will negatively

impact the Service's relationship with other stakeholders, undermine its

relationship with private land owners, (Doc. 19-6 at ¶ 10), and "upend decades of

proactive, collaborative, good faith work with other federal, state, Indian, and

private conservation partners," (*id.* ¶ 11). These targeted relationships, however,

are insufficient to overcome the "strong public interest in maintaining wild areas

unimpaired by man for future use and enjoyment." *High Sierra*, 390 F.3d at 643.

Given the importance of wilderness areas, complete judicial review is required.

*See Wilderness Watch v. Perdue*, 805 F. App'x 476, 481 (9th Cir. 2020) ("The

public interest suffers when actions in the wilderness evade judicial review."). the

balance of the equities therefore tips sharply in Plaintiffs' favor.

## IV.   Bond

Although preliminary injunctions are generally subject to bond, *see* Fed. R.

Civ. P. 65(c), "[i]t is well established that in public interest environmental cases

the plaintiff need not post bonds because of the potential chilling effect on

litigation to protect the environment and the public interest," *Central Or.*

*Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012). "Federal

courts have consistently waived the bond requirement in public interest

environmental litigation, or required only a nominal bond." *Id.* Thus, no bond is

required here.

## CONCLUSION

Accordingly, IT IS ORDERED that Plaintiffs' motion for preliminary injunctive relief (Doc. 6) is GRANTED.  While this action is pending, the Service is ENJOINED from engaging in any Project-related construction activities or other prohibited activity within the Wilderness area.

DATED this 2nd day of August, 2023.

10:39 A.M.

Donald W. Molloy, District Judge
United States District Court